SILAS L. MERRILL v. MOSES H. GRINNELL and ROBERT B.
MINTURN.

The baggage of a passenger, entrusted to one whose business it is to transport persons and their baggage, and with whom the owner has embarked, is under the same protection as the goods which are entrusted to a common carrier of goods.

A proper sum of money, for traveling expenses, contained in the trunk of a passenger, is to be considered as a part of his personal baggage, and may be recovered for, as such.

The amount must be measured not alone by the requirements of the transit over a particular part of the entire route to which the line of one class of carriers extends, but must embrace the whole of the contemplated journey; and includes such an allowance for accidents or sickness, and for sojourning by the way, as a reasonably prudent man would consider it necessary to make.

Whether the amount claimed, in the case of a loss, is reasonable or excessive in a particular instance, must depend upon the character of the journey and the special circumstances of the case.

It should be limited to money taken for traveling expenses properly so called.

The question as to the reasonableness of the amount of money carried by a passenger in his trunk, for his traveling expenses, is one to be determined by the jury, or by a referee; and if it has been passed upon by a referee, in a given case, his decision should not be disturbed.

Opinions of witnesses may be received as to the value of chattels, and a witness who has been in this country five years may be allowed to testify as to the value of the contents of a trunk, from knowledge acquired since he came to this country, and to prove that he has made inquiries here as to the value of articles of that kind.

A right of action against a common carrier to recover the value of property entrusted to him, is assignable; and the assignee may sue in his own name.

The liability of a carrier, for the baggage of a passenger, is the same as for freight. He is liable as insurer for both.

*Appeal by the plaintiff from an order of the Supreme Court awarding a new trial, where judgment had been given against the defendants on the report of a referee.*

THE action was brought to recover the value of a trunk and its contents, consisting of clothing, money and some other things, which it was alleged one Eugene Strachwitz delivered to the defendants, as common carriers, on the

high seas between Liverpool and New York, on board their ship Liverpool, to be carried from the city of Liverpool to New York, for a reasonable compensation; which duty, it was alleged, they neglected to perform; so that the trunk and contents were wholly lost to Strachwitz, the owner. The plaintiff was the assignee of the demand, under a transfer executed by Strachwitz. The answer admitted that the defendants were the owners of the vessel, but traversed the other allegations by a statement of want of knowledge sufficient to form a belief. The case was first tried in November, 1855; when the plaintiff was non-suited. The last trial was in August, 1857.

The conclusions of fact of the referee affirmed that the defendants were the owners of the ship Liverpool, and were engaged as carriers in the business of transporting emigrants from Liverpool to New York; that Strachwitz was an emigrant passenger on the ship from Liverpool to New York, leaving the former port about the first of August, and arriving at New York the 15th of September, 1852; that he purchased a ticket of one Rickerts, an agent of the defendants at Hamburgh, for the transportation of himself and his baggage from Hamburgh to New York, via Hull and Liverpool, for thirty-six dollars; that his baggage consisted of a black leather trunk and its contents, and some other articles; that at the time of purchasing said ticket said Rickets saw said trunk and inquired of Strachwitz whether it contained valuables, and was informed that it did; that Strachwitz. with a number of other emigrants, went, under the charge of a servant of Rickerts, on a steamer from Hamburgh to Hull and on the railroad from Hull to Liverpool, using said ticket as evidence of his right to passage; that, at Liverpool, the ticket was exchanged by direction of the servant of Rickerts, without additional payment, for another, which was received by the officers of the Liverpool in full payment of the transportation of Strachwitz and his baggage from Liverpool to New York; that on Strachwitz's coming on board, the

officers of the ship took possession of the trunk and its contents, lashing said trunk to the center of the steerage, where at times said Strachwitz had access to it and at other times had not; that said trunk and its contents were, without his fault, stolen on the voyage and lost to him; that during the voyage and on arrival at New York, Strachwitz demanded the trunk of the mate and other officers of the ship, but they neglected and omitted to deliver it, and he has never received it. The referee set out a list of the contents of the trunk, with a valuation of the several items. Among them were $800 in money, in gold, six dozen of shirts, and other clothing in large quantities, two swords valued together at $68, and some other articles, making, in all, the value of $1,991.27. The referee further found that said Strachwitz, just before his departure from Hamburgh, was an officer in the Prussian military service; that the articles of wearing apparel mentioned in the list were in quality and number such as were accustomed to be possessed and owned by persons in his condition in life by the custom of the country where he resided, and that the other articles were suitable for a person in his station in life; that said Strachwitz left Liverpool with the intention of proceeding to San Francisco, California, and that he placed said gold coin in said trunk to defray the expenses of the journey.

The referee found that Strachwitz had assigned his demand against the defendants to the plaintiff for a valuable consideration; and, as a conclusion of law, determined that the plaintiff was entitled to recover the value of the trunk and property, with interest from the time of the arrival of the vessel in New York, the amount being $2,346.91.

The findings were duly excepted to by the defendants' counsel.

It appears by the case that certain exceptions were taken in the course of the trial, and that the defendants also excepted to the refusal of the referee to non-suit the plaintiff.

It further appears by the opinion of the supreme court that the new trial was granted on the sole ground that a passenger was not entitled to recover for *money* carried in a trunk which was stolen. The order, however, declared that the reversal was on account of error of fact as well as of law.

The plaintiff appealed from the order of the general term, giving the usual stipulation required in such cases.

*J. H. Reynolds*, and *John C. Strong*, for the appellant.

*J. Larocque*, for the respondent.

DENIO, Ch. J.    The case is presented by the record in a form which requires us to review the conclusions of fact as well as the determination of matters of law.  The questions are therefore substantially the same as those which would arise upon a motion to set aside a verdict or report, as being against the weight of evidence and against law.

The defendants' counsel insists, in the outset, that the whole cause of the plaintiff is false and fabricated; that he was not a passenger on the defendants' vessel upon the voyage mentioned, and did not lose any property in the manner claimed.  The evidence certainly presents some circumstances of a remarkable, and, at the first view, of a suspicious character.  Strachwitz himself is the only witness who gives any evidence of his possession of the property in question, of his departure from Germany, or as to his presence on the vessel during any part of the voyage described by him; and he was not able to produce any document or paper, of any kind, showing his connection with the vessel or any of its officers, or the other passengers.  In addition to this, the defendants produced what they claimed to be a correct list of the passengers in the vessel, upon that voyage; which was to a certain extent verified by the master, as a witness, on the trial, and which, although it embraced more than five hundred names, did

not contain that of Strachwitz, nor any one resembling it, or which might be mistaken for it. Moreover, the master, who was examined on behalf of the defendants, denied having seen Strachwitz during the voyage, or at its termination, or at any time until shortly before the trial. With all these disadvantages, he was able to convince the intelligent referee, before whom the issue was tried, of the integrity of his statements, and of the general truth of his narrative. His account was substantially as follows: He said he was a native of Namslau, in Prussia; that after receiving a good education he commenced life as a common soldier, in the Prussian service, though he was the son of noble parents, his father being a baron and a person of considerable property; that he was raised to the rank of lieutenant, and, at the commencement of the year 1852, was stationed at Spandau with a part of his regiment; and that he there engaged in a duel with his captain, who was wounded, which circumstance compelled him to leave the country; for which purpose, with the assistance of some friends, he proceeded to Hamburgh by the way of Lansdorff and Berlin, with the purpose of embarking for San Francisco. The money and clothing which he claims to have lost, were furnished by his relatives or on their credit. That there was no vessel going from Hamburgh to California, and he was advised to sail for New York, which he concluded to do; that he was taken by a waiter in the hotel where he lodged to the office of one Rickerts, who represented himself as authorized to sell tickets for passage from Hamburgh to New York; that he purchased a ticket for New York, for which he paid $36; that Rickerts changed his money, which was in Prussian currency, into American coin, and furnished him with a bag in which to put it; that Rickerts saw the witness's trunk, and that the conversation respecting it took place as mentioned in the findings. There were other Germans who were also going to New York, and Rickerts sent a servant with them and the witness, and they proceeded in a steamer to Hull, and

thence by rail to Liverpool—his ticket, purchased of Rick-
erts, serving him instead of payment of the fare.   At
Liverpool, this ticket was, by direction of the servant,
exchanged for one for the ship Liverpool, which was done
at an office on shore; that he then embarked on the ship;
and that before sailing the passengers were assembled on
the deck and required to show their tickets, after which
they passed into a space formed by stretching a rope
across, and from thence passed into the steerage.   The wit-
ness said he showed the ticket he had received at Liver-
pool, passed into the open space, and was not required
otherwise to pay for his passage; that the ticket was given
up to the officer of the ship; that during the voyage an
Irish passenger had his coat stolen, and search for it was
made, and the witness, among others, was obliged to open
his trunk, and it was examined in the presence of the doc-
tor, the second mate, and the ship's boy, and, he said, they
seemed to be surprised at its contents.   The following
morning, early, the witness missed the trunk.   It was pre-
sent, and he had been sitting on it, till he retired.   He
complained to the first mate, and demanded his trunk of
him, and some search was made among the sails, and in the
boxes of the sailors and steerage passengers, but no vestige
of the trunk or its contents was found, except a leathern
segar box which had been in the trunk; and nothing had
been heard of it since.

On the arrival of the vessel in New York, he said he
endeavored to communicate with one of the small boats
which surrounded the vessel, but they were not permitted
to come near enough.   A steamboat came alongside, and
the doctor and passengers went ashore.   The captain at
the same time went ashore in a small boat.   The witness
was requested to leave the vessel, but he declined to go
unless they would give him his trunk, but he was finally
forced on board the steamboat, and taken ashore.   He
applied, in the first instance, to Mr. Schmidt, the Prussian
consul, who advised him to go to a lawyer, which he did,

taking along a person who could speak English and German, but the lawyer required him to advance ten dollars, which, having lost everything, he was unable to do. Finally the German society gave. him a railroad ticket to Buffalo, whither he went in three days after his arrival, and he has not been in the city since. Since then he has had employment for some time as a private tutor in the family of a farmer, and after a time he was. introduced to the plaintiff's attorney, and wrote or studied in his office as a clerk. It was thought advisable, he said, that he should transfer his claim to some other person, on account of his having to be a witness, and the plaintiff was suggested as a proper person. He is a relative of the wife of the plaintiff's attorney. He sold it to the plaintiff for $1,500, and received his note, which is still upaid.

The foregoing is only an outline of the testimony of Strachwitz, who was examined and cross-examined at very great length, upon many facts and circumstances of his personal history not material, except as to his credibility. His testimony appears to me to contain a natural and not improbable narrative of the events as to which he was examined. It was either true in substance or ingeniously contrived.

But he was confronted with the alleged list of passengers, and the absence of his name among those recorded there is a circumstance of great weight against him, if the paper is truly a list of the passengers, as it was claimed to be. But I think it is not. The document is headed: "Report and manifest of the *cargo* laden on board the Liverpool, whereof William P. Gardner is master," &c. It contains five hundred and one names, and opposite many of the names is the words *one box, two boxes,* &c., specifying the number, and amounting, in one instance, to as many as seventeen boxes. Where no entry of boxes is placed opposite a- name, there is a mark ( " ) such as in inventories and bills of parcels generally indicates that the number is the same as the last preceding entry. But such does not

seem to be the precise meaning of this list. The mark usually denoting iteration means here that the persons, opposite whose name it is placed, have a certain connection with the boxes, last entered, as belonging to the same family or party. Thus, taking one case for an example, the entry is:

    Edward McCormick, two boxes.
    Eliza          "         "
    Sarah          "         "
    Margaret       "         "

The family name of all the parties thus set down as the owners of one or more boxes, are not always the same, but the instances of that are sufficiently frequent to show the general intention of the entries. There are two instances where the marks of iteration are omitted, but it is easy to see that this was a mere error of transcribing or printing, the identity of name showing that they formed the same family group as in the other cases. The purpose of the paper was not, therefore, I believe, to have a list of all the passengers' names, but an account of the parcels imported, and the names of the emigrants claiming those parcels. This is apparent from the *heading* of the document which I have already referred to, which entitles it "a report and manifest of *the cargo*," &c., without any reference to the names of the passengers. The master's oath, which is required to be delivered at the same time with the manifest, and which was given in evidence upon the trial of this case, omits any mention of passengers, and in no manner affirms anything on that subject. But if the provisions of law were observed as to this ship, in regard to the importation of emigrants, there was a distinct manifest of passengers altogether different from the vague paper which was given in evidence. For an act of congress, approved March 2, 1809, (3 Stat. at Large, 488,) contains an explicit direction which, on account of its important bearing upon this branch of the case, I transcribe: " § 4. And be it further enacted that the captain or master

of any ship or vessel arriving in the United States, or any of the territories thereof, from any foreign place whatever, at the same time that he delivers a manifest of the cargo, and if there be no cargo, then at the time of making report or entry of the ship or vessel, pursuant to the existing laws of the United States, shall also deliver and report to the collector of the district in which such ship or vessel shall arrive, a *list or manifest of all the passengers* taken on board of the said ship or vessel at any foreign port or place; in which list or manifest it shall be the duty of the said master to designate particularly the age, sex and occupation of the said passengers respectively, the country to which they severally belong, and that of which it is their intention to become inhabitants; and shall further set forth whether any and what number have died on the voyage, which report and manifest shall be sworn to by the said master in the same manner as is directed by the existing laws of the United States in relation to the manifest of the cargo; and that the refusal or neglect of the master aforesaid to comply with the provisions of this section shall incur the same penalties, disability and forfeitures as are at present provided for a refusal or neglect to report and deliver a manifest of the cargo aforesaid." It seems to me highly improbable that the duty prescribed by this provision was omitted in the present case where so large a number of foreigners were brought into the country. The government, it is known, assumes to obtain statistics of the emigrations of persons by sea into the United States, and for that purpose provides statistical tables showing the nationality and the place of embarking and other particulars in regard to the emigrants arriving upon our shores. None of these things, it is obvious, are shown by the imperfect paper which was produced by the counsel for the defendants. That paper had, however, an appropriate office quite distinct from that of furnishing a manifest of passengers, as may be seen by a reference to other provisions of the revenue laws. The "wearing apparel and other personal baggage,

and the tools and implements of a mechanical trade," of persons who arrive in the United States by sea, are declared free and exempted from duty, but an entry is to be made of them before a permit for landing can be granted; but the collector, instead of requiring a formal entry, may send an inspector or surveyor on board to examine the passengers' baggage and make report of it. (Act of 1799, 1 Stat. at Large, p. 627, § 46.) In practice, I believe, one of these officers makes a cursory examination of the trunks and boxes of the passengers, and allows them to be taken on shore without any formal entry. But there is a clause in the oath which the master is required to make, on delivering his manifest to the collector, to this effect: "that no *package whatsoever* of any goods, wares or merchandize have been unladen, landed, taken out, or in any manner whatsoever removed from on board, except such as are more particularly described and declared in the *abstract or account herewith*," &c. (Id. § 30.) The oath of the master, which was given in evidence, contains this clause in the precise language of the act of congress. Where, therefore, goods, which would include passengers' baggage, have been taken on shore upon the summary examination of an inspector, without a formal entry, it is necessary for the master to deliver, with his manifest of cargo, this abstract or account. The names of passengers having baggage, and a statement of the boxes or parcels in which it was contained, would perhaps sufficiently answer this requirement. A compliance with this provision was, I am inclined to think, the purpose of the paper which is claimed to be a manifest of passengers. It was an account of this part of the cargo, which had been delivered without other authority than the summary examination of an inspector, and which was excepted out of the otherwise general oath of the master, that nothing had been removed.

Now, when this vessel arrived in New York, Strachwitz had no trunk to be removed, if, as he testifies, it had been stolen on the voyage. If the officers of the ship had

acknowledged the loss, they might properly enough have included his name and inserted an entry of his trunk on the list as a package which had been removed. But they had not done this; but, on the contrary, had repudiated his claims and forced him off the vessel without giving him any satisfaction respecting his property. He was in their view simply a passenger who had no trunk or box of which an account was required. His name, upon their theory, had no place on the list of passengers having baggage, and it would naturally have been omitted. Its absence, therefore, affords no presumption that he was not a passenger. If the defendants had produced the manifest of passengers authenticated according to the act of congress, it would, as a cotemporary document required by law to be made, have been presumptive evidence against the plaintiff upon the question of Strachwitz having been a passenger. It would not, of course, have been conclusive, as it would not have been in the power of the master to conclude him by an *ex parte* statement and affidavit.

There was no satisfactory verification of the statement arising out of the testimony of the master. Only a part of it was in his handwriting, and what he did write was upon the information of others. He does not profess to have seen or known anything of the steerage passengers. Nor does he say anything, of his personal knowledge, respecting the presence or absence of Strachwitz. If he was able to say positively that there was no complaint that a trunk had been missed during that voyage, it would be something. But all he can say is that he does not know of the doctor and mate making search for lost baggage, but he declares that it was very common to have such searches. He cannot recollect the name of the doctor or second mate.

Upon the whole I do not find anything in the document produced, or in the testimony of the master which should materially impair the credit to be given to the oath of Strachwitz. I have already said it was not confirmed by any other witness, or by any document. But for some con-

siderations which I am about to mention I should say the case depended wholly upon his testimony.

There are however in the testimony some coincidences which tend, I think, to confirm to some extent the evidence of Strachwitz. He was the first witness sworn, and his direct examination brought out a brief statement of his embarkation and arrival in New York and the loss of his trunk, and a description of its contents. He was cross-examined by the defendants' counsel apparently for the purpose of finding matter upon which he could be contradicted. It was a perfectly legitimate method of testing his credibility. It correctly assumed that it would be difficult for him to describe the incidents of a voyage if he was not on board the vessel, and that one who commanded the ship could readily confute him, if his story was a fabrication from beginning to end, as it was claimed to be. He was cross-examined upon this sensible system, and seems to have been required to mention any noticeable incidents which occurred during the voyage. Among others, he stated this: that he saw the captain's steward cruelly beaten by the hands and heels of the captain. There is no reason to suppose that such a circumstance would be an ordinary or common event in a packet ship. Strachwitz presumed to swear to it, with a knowledge that the master was present and was to be examined. It was a matter personal to him and one not likely to be forgotten. It was a thing which Strachwitz could not have known unless he was on board. What the master says on his examination, after having heard this testimony of Strachwitz, is this: "I believe I had a difficulty with my steward. * * Very likely I ordered or *inflicted* personal chastisement of this steward, but I do not recollect it; probably I did it if he deserved it. I will swear nothing about it." Question—"Will you swear that you did not do it by kicking." Answer—"I will swear nothing about it." In a subsequent part of his examination the master stated that he went to Canada three or four weeks after the ship reached New York. He said

he did not *know* that he was prosecuted by the steward, but he said at last "I went *perhaps partly* on account of such prosecution." Now the degree of severity with which the steward was punished, if he was punished, or whether he deserved to be punished, is immaterial to the present question. The point is whether Strachwitz was able to state a circumstance of an unusual nature transpiring on board the ship, which is shown by the defendant's testimony to have actually taken place. If he *could* do so, he must probably have been present; and I think he did.

Again, Strachwitz testified that during the voyage a sailor was obliged to run round the deck in a circuit. At the four corners were placed officers of the ship with pointed sticks, and stabbed him as he passed, three or four black fellows with ropes, and knots in them, following him, striking with the ropes until he fell down, and the captain struck him in the mouth with his heels. When interrogated, the master said he heard that a man was run round the ship, stabbed and struck, but did not see it. Such a thing, then, occurred during the voyage. That is sufficient to identify the transaction. The compelling a man to run round the ship, and to be beaten and stabbed, could not often occur, unless shipmasters are more brutal than is generally supposed. It did occur, or was said and believed to have occurred on this voyage according to the testimony of the master. Strachwitz says he saw it, which he could not have done unless he were present. It is not to be supposed that he invented such a story in pure wantonness and that it turned out to be true. Whether the captain saw it the took part in it, as Strachwitz says, or not, is not important. That is a question of veracity between the two witnesses, not material to the main issue; but the substantial identity of the transaction which, by the master's admission, was said to have taken place, and which Strachwitz says he saw, proves, or very strongly tends to prove, that Strachwitz was a passenger on that voyage. There are two other occurrences about equally pertinent,

and several where the facts might have occurred on any voyage, and which, therefore, Strachwitz might have invented. The two instances which I have mentioned present some of those undesigned and unpremeditated coincidences which show the truth of a narrative more satisfactorily than a considerable amount of positive evi-dence. If Strachwitz was not a passenger, his statement of these transactions, which are shown to have taken place, must have been a pure invention. That they turned out to be true, if not literally, in such a sense, at least, as to substantially correspond, shows that Strachwitz's story was not a fiction, but was true so far as he asserted that he came to this country on that ship and on that voyage.

There is one other circumstance to be adverted to before closing this part of the case. These persons, Strachwitz and the master, saw but little of each other on board the ship, if the former was actually there. The inability of the master to recognize Strachwitz proves nothing, as he may never have noticed him on board. But the master held a position which would render it probable that his person would be known and remembered for some time by every passenger. It is conceded that these persons had not seen each other from the time of the arrival of the ves-sel in New York, until about the close of the first trial, almost three years afterwards. Mr. Babcock, a witness for the defendants, who was their counsel on the first trial, swears that immediately upon his coming into the room Strachwitz exclaimed *that is captain Gardner of the ship Liverpool.* There is no evidence that he had been other-wise informed of his identity with the master.

Some discrepancies were shown upon immaterial matters between the statements of Strachwitz made on the first and the second trial, but they were not of a nature in my opinion to shake his credit.

In determining disputed questions of fact, left doubtful upon the actual evidence, it is sometimes useful to inquire upon which party the onus rests to clear up the difficulty

and dispel the doubt; and the general rule is that it is upon the party who possesses to the greatest extent the means of doing so. If I am right in supposing that there exists in the collector's office an authenticated list of passengers, sworn to by the master according to law, the defendants, whose officers prepared and delivered it at the custom house are the parties who should have procured and produced it. They had sufficient notice that the plaintiff would give *prima facie* evidence that Strachwitz was a passenger, for he had sworn to it on the first trial. They proposed to attack that evidence and to convict the witness of perjury and fraud. They were bound, I think, to obtain and give in evidence the manifest of passengers. It was scarcely fair to leave that behind and rely upon the other paper which does not profess to have been made up for that purpose. Then they called as a witness an officer of the ship, who, though first in rank, had the least to do with the steerage passengers, and who was not at all likely to have known Strachwitz if he really came over in the steerage; and they called no one who was at all conversant with that class of the passengers. The plaintiff, it is true, could have sent a commission to Germany and might possibly have shown the circumstances of his departure from that country, and thus have corroborated him. So it is probable that sufficient exertion would have enabled the plaintiff to find some of the German passengers, twelve or thirteen in number, who came over at the same time and might have remembered Strachwitz. It does appear from Strachwitz's testimony that he had made ineffectual enquiries for one of those. If he was honest and was really a passenger, as he says, he could not know and would not be likely to suspect that his statement that he was on board would be questioned. The first trial had not gone far enough to disclose that, as the plaintiff was non-suited on his own evidence.

I conclude that there was other evidence readily obtainable by the defendants, if they are right in the controversy, which they have neglected to produce.

Upon a careful examination of the testimony, I am of opinion that the referee came to a correct conslusion upon the main questions of fact. That Strachwitz sailed in the ship Liverpool on the voyage mentioned I do not at all doubt. That his trunk contained all the valuable things which he mentioned, we have only his testimony, given, I admit, under circumstances which create a suspicion of interest on his part. But the referee has believed him, and I see no ground for reversing that determination. He had some advantages which we do not possess. The cases are rare in which it would be proper to set aside the determination of the primary tribunal upon a question of fact depending upon the credibility of a witness not impeached or successfully contradicted.

Whatever doubt may formerly have been entertained, it has been settled, for a considerable time, that the baggage of a passenger, entrusted to one whose business it is to transport persons and their baggage, and with whom the owner has embarked, is under the same protection as the goods which are entrusted to a common carrier of goods. (*Powell* v. *Meyers*, 26 Wend. 591.) That case having been determined by the court for the correction of errors, no further authority is needed than the opinions of the members of the court and the prior cases on which they rely. The only question upon which any uncertainty remains is, whether a proper sum of money, for traveling expenses, contained in the trunk of the passenger, is to be considered as a part of his personal baggage; and this is less clear than the former proposition upon the cases in this state. Assuming it not to have been adjudged, but to depend upon the reason of the thing and upon legal analogies, I am of opinion that it should be regarded as a part of the baggage. The reason why property of any kind is included in the contract of carriers of persons, is that it is the universal, or very usual, concomitant of a journey, whether by land or water, for the traveller to take traveling conveniences along with him. In the infancy of society, and now

39

among barbarous people, persons may perform journeys without a change of raiment, and may rely upon charity or rapine for the means of subsistence. But this is all different now with us; and men who engage in the business of transporting persons from one part of the country, or of the world, to another, must make provisions for carrying also whatever may be reasonably necessary to the traveller, under ordinary circumstances, for the prosecution of the journey, or they will be wholly without employment. Nothing, of course, can be more essential to this end than an adequate supply of money for traveling expenses; and the amount must necessarily be measured, not alone by the requirements of the transit over a particular part of the entire route, to which the line of one class of carriers extends, but must embrace the whole of the contemplated journey, and include such an allowance, for accidents or sickness, and for sojournings on the way, as a reasonably prudent man would consider it necessary to make. Whether the amount claimed in the case of a loss would be reasonable or excessive in a particular instance, would depend upon the character of the journey and the special circumstances of the case. It is very clear that it would not include funds carried for the purpose of transportation or remittance, or for investment in another locality. It should be limited to money taken for traveling expenses properly so called. When thus limited, the principle does not involve any departure from the rule that the liabilities of the carrier are imposed in respect to the compensation paid, but is in strict accordance with that principle.

The rule, as I have stated it, though not affirmed by express adjudications in this state, is not controverted by any adjudged case in the superior courts, but is more consonant with the general indications of judicial opinion than the one which would exclude money from the category of traveling conveniences. In *Hawkins* v. *Hoffman* (6 Hill, 586), Judge BRONSON expressed a doubt whether a reasonable sum for traveling expenses, carried in a passen-

ger's trunk, could be included in his baggage. The case did not involve any such question, and the remark was quite incidental and wholly obiter. The journey which was under consideration was a short inland one, and the judge's idea was that money for expenses was, in such case, usually carried on the person of the traveler. I think the remark scarcely accords with common experience in the case of long journeys, and it certainly does not, where the voyage is by sea and extends from one hemisphere to another, as was the fact in the present instance. In *The Orange County Bank* v. *Brown* (9 Wend. 85), NELSON, J., in the same incidental way, had intimated that a reasonable sum for traveling expenses could, in such cases, be recovered for. In *Weed* v. *The Saratoga & Schenectady Railroad Company* (19 Wend. 534), a sum of $285, contained in a traveler's trunk, was recovered for, under a charge in which the reasonableness of the amount was submitted to the jury; and Judge COWEN prepared and delivered an opinion for denying a motion for a new trial, expressly approving of the manner in which the question respecting the money had been left to the jury. The other judges did not express any opinion upon that point; but a new trial was granted for another cause, namely, that the money did not belong to the passenger, but to another person for whom he was the bailee. In *Taylor* v. *Monnot*, in the superior court of New York (4 Duer, 116), the question under consideration arose collaterally. The action was brought against the keeper of a hotel, by a lodger whose portmanteau had been broken open and $353.54 in money contained therein stolen. The law was assumed to be that a traveler, whose trunk had been lost, could be a witness, from necessity, in his own action against the party liable to respond, as to the contents of the trunk, on the ground that no other person would be likely to know the same; but only in respect to personal baggage; and hence the question arose whether the money in question came under that denomination, the owner, who was the witness, being

upon a journey from Europe.  It was held by the court, upon a full examination of the precise question we are now considering, that it did.  In Massachusetts the question is definitely settled by the case of *Jordan* v. *The Fall River Railroad Company* (5 Cush. 69).  The sum of $325, placed in the trunk of a traveler, which was lost upon a very short journey, was recovered.  The judgment was sustained by the court.  Similar decisions have been made in Ohio, Tennessee, Illinois and Indiana, and in the court of common pleas of the city of New York.  (9 Humphrey, 61; 11 id. 419; 10 Ohio, 145; *Davis* v. *Michigan Central Railroad Co.*, 22 Ill. 278; *Doyle* v. *Keyser*, 6 Ind. 242; *Duffy* v. *Thompson*, 4 E. D. Smith, 178.)

I am of opinion that the report of the referee in this case was not impeachable for including the $800 in coin contained in Strachwitz's trunk.  He necessarily passed upon the reasonableness of the amount, and I see no ground for questioning his judgment.

What remains to be said relates to certain specific exceptions taken on the trial.

Strachwitz, when called as a witness, was objected to, and the only ground specified, in the first instance, was that no sufficient notice of his examination had been given.  As section 399 of the code stood when the trial took place, no notice was necessary unless the person proposed to be examined was either a party to the action or a person for whose immediate benefit the action was brought.  The proposed witness was not a party, and there was then no ground for saying that the action was brought for his benefit.  But, immediately afterwards, the defendants' counsel proposed to examine him preliminarily " as to his interest as a witness."  The objection of interest, on the question of competency, having been abolished, there was no propriety in such a preliminary examination.  It was not proposed to show that the action was for his immediate benefit.  The language in which the offer was made would not suggest such an idea.

The defendants' counsel excepted to the ruling of the referee, by which Strachwitz was allowed to testify as to the value of the trunk from knowledge acquired since he came to this country; and to proof, by him, of the fact that he had made enquiries here as to the value of articles of that kind. Opinions of witnesses are received upon questions as to the value of chattels. The witness had been in this country five years, at the time of the trial. I think he was competent to speak of the value of the trunk here, and that there was no error in allowing him to state the means of knowledge which he had acquired.

The quantity of linen clothes which Strachwitz swore was in his trunk, was much larger than gentlemen in this country are accustomed to carry on a journey however remote, or to possess. The circumstance tended in some degree to discredit his testimony. To obviate this, the plaintiff was permitted to prove a custom prevailing in Germany, by which large quantities of such clothing were accustomed to be kept by individuals. The reason of this is said to be that the washing is done much less frequently than with us, and hence the quantity of linen kept for use must necessarily be increased. I think it was competent thus to account for what seemed peculiar in the contents of the trunk.

The objection based upon the alleged discrepancy between the complaint and the case as proved, was not well taken. Whether the duty alleged to be violated was to carry the trunk as freight, under the ordinary contract with a common carrier or as the baggage of a passenger, the obligations of the defendants were precisely the same. I am of opinion that under the former rules of pleading the evidence would have been admissible, as the obligation would have been correctly stated, and the consideration alleged only in a general way. But if I am mistaken in that, the fault was simply a variance in stating the consideration. The present practice requires such variances to be disregarded unless an affidavit is made according to the

code. (*Catlin* v. *Gunter*, 1 Kern. 368.) It did not present the case of a failure of proof.

There was sufficient evidence of the agency of Rickerts. The officers having charge of the defendants' vessel recognized the ticket which Strachwitz presented on board. That, although not the one which was received from Rickerts, was a ticket which was obtained by an exchange of the other, effected through the agency of Rickerts, by the person he employed to accompany the emigrants from Hamburgh. There is not the slightest evidence that he was himself engaged, on his own account, in any business of transporting passengers to America. The inference from the testimony is that he professed to be authorized to contract for passages in behalf of the several carriers between Hamburgh and New York. The defendants' officers recognized the engagement he had made with Strachwitz.

It was objected on the argument that the demand was not assignable. There was no such point made on the trial; but it would not have been tenable if made. The assignability of such causes of action has frequently been affirmed in this court. (*McKee* v. *Judd*, 2 Kern. 622; *Waldron* v. *Willard*, 17 N. Y. 466.)

There is no ground for saying that a fraud was committed by Strachwitz in concealing or misrepresenting the contents of the trunk. He answered truly the enquiries of Rickerts, so far as they called for information on that subject. Besides, if I am right in supposing that the property and money in the trunk fell within the fair meaning travelers' baggage, it is precisely what the defendants undertook to carry, and they cannot pretend that they were deceived into attempting to carry something more.

There were some other points made on the motion for a non-suit which do not call for any particular remark. I think neither of them were well taken.

My conclusion on the whole case is that the report of the referee was right, and that the supreme court fell into an

error in ordering a new trial. The order appealed from should, therefore, be reversed, and the judgment entered on the report of the referee be affirmed.

MULLIN, J. A new trial was granted by the court below solely on the ground that the referee gave judgment in favor of the plaintiff for the $800 in gold, found to have been in the trunk at the time of its loss. GROVER, J., puts himself exclusively on this ground. And, although MARVIN, J., discusses several other questions, and expresses doubts whether the referee did not err in deciding some of them, yet he finally concurs with Justice GROVER for reversal upon the ground taken by him. This being so, we must consider all the other questions raised on the trial to have been decided in favor of the appellant, and they are not before us for review on this appeal.

A contract by a common carrier of passengers, to carry a passenger from one place over his line or route to another, obliges the carrier not only to carry the passenger, but a reasonable amount of personal baggage, although nothing is received or paid for this carriage of the baggage in addition to that paid for the carriage of the passenger. (Angell on Carriers, § 107, 108, 109; *Hawkins* v. *Hoffman*, 6 Hill, 586; *Powel* v. *Myers*, 26 Wend. 591; *Orange Co. Bank* v. *Brown*, 9 Wend. 85; *Camden & Amboy R. R. Co.* v. *Burke*, 13 id. 611; *Hollister* v. *Nowlen*, 19 id. 239; *Cole* v. *Goodwin*, id. 251.)

The liability of the carrier for the baggage of a passenger is the same as for freight. He is liable as insurer for both. (Parsons' Mercantile Law, 226, 227; 2 Kent's Com. 602; *Hollister* v. *Nowlen*, 19 Wend. 234; *Cole* v. *Goodwin*, id. 251.)

A carrier may, by notice, limit his liability for goods sent by him to an amount to be named by him, unless the contents of a box, bale, or parcel, if they exceed such sum, be disclosed to him to the end that he may demand such additional sum for his risk as may be agreed upon.

(Angell on Carriers, § 232 to 236; *Clay* v. *William*, 1 H. Black, 289.)

In the absence of an express agreement or notice limiting liability, a carrier of freight is liable for property delivered to him for carriage without regard to the kind or value. In 2 Kent's Com. 603, it is said: The common carrier is answerable for the loss of a box or parcel of goods though he be ignorant of the contents, or though those contents be ever so valuable, unless he made a special acceptance. But the rule is subject to a reasonable qualification; and, if the owner be guilty of any fraud or imposition in respect to the carrier, as by concealing the value or nature of the article, or deludes him, by his own carelessness in treating the parcel as a thing of no value, he cannot hold him liable for the loss of the goods.

Had the trunk in question been delivered to the defendants to be carried as freight, they would have been most clearly liable for its contents. There was no notice limiting their liability, or requiring passengers to disclose the contents of their trunks. On the evidence there is no ground whatever for imputing to Strachwitz fraud or concealment. The defendants' agent, Rickerts, inquired of S. whether the trunk was valuable, and he was told that it was. This was all S. was called on to say, unless further inquiries were put to him, and enough was said to inform the defendants that if parcels were to receive attention in proportion to their value, the trunk in question needed such care, or if the defendants were entitled to demand an additional price for the increased risk, that the trunk was one which justified such charge. But neither Rickerts, nor any officer of the ship made any further demand as to the contents of the trunk or their value, nor was any further sum for its carriage demanded. S. it seems to me said and did all that could be reasonably required of him to protect the defendants.

The trunk is to be treated as the baggage of Strachwitz, and not merely as freight. And being baggage the defend-

ants become liable only for such as a traveler usually carries with him for his personal convenience. This embraces such articles as it is usual for persons to carry with them whether from necessity or for convenience or amusement. Tools used by the passenger in his trade; (*Davis* v. *Cayuga & Susquehanna R. R. Co.*, 10 How. Pr. 330;) gems; (*Same and Van Horn* v. *Kermit*, 4 E. D. Smith, 453;) a watch and such jewelry as is usually worn about the person; (*McCormick* v. *Hudson River R. R. Co.*, 4 E. D. Smith, 181;) money for traveling expenses. (*Duffy* v. *Thompson*, 4 E. D. Smith, 178; *Orange Co. Bank* v. *Brown*, 9. Wend. 85; *Grant* v. *Newton*, 1 E. D. Smith, 95; Angell on Carriers, § 115; *Jordon* v. *Fall River R. R. Co.*, 5 Cush. 69; Parsons' Mercantile Law, 225; *Weed* v. *Saratoga R. R. Co.*, 19 Wend. 534.)

The case last cited is the only one in the supreme court that can be said to hold the carrier liable for money contained in the trunk of a passenger. In *Orange Co. Bank* v. *Brown*, 9 Wend. 85, it was said by Justice NELSON that money is not a part of a passenger's baggage, beyond such sum as is reasonably necessary for his expenses. Even this doctrine was repudiated by BRONSON, J., in *Hawkins* v. *Hoffman*, 6 Hill, 586.

The common pleas of New York, in *Duffy* v. *Thompson* and *Grant* v. *Newton*, cited *supra*, has held, in conformity with the dicta in the 9 Wend. 85 and the 19 Wend. 534, that money for necessary expenses may be recovered for as part of a passenger's baggage.

In Massachusetts, Ohio, Pennsylvania, Illinois and several other states, the liability of the carrier is well settled, and has been for several years.

The question is distinctly presented by this appeal, and if it has not yet been decided in this state, it is our duty now to finally dispose of it.

*Baggage* is defined by Webster to mean "the clothing and *other conveniences* which a traveler carries with him on a journey." It is, of course, impossible to enumerate the

articles that constitute what is called, in the definition, clothing; and it is still more difficult to specify what shall pass under the name of "*other conveniences.*" The poor man and the rich carry baggage, and each pay the same fare to the carrier; but the baggage of the two men differ materially in the number and quality as well as in value. While the risk incurred by the company for the loss of the baggage of the one may be $100, in the other it may be five times that sum. To attempt to limit the amount of baggage for which a company shall be liable would be productive of great annoyance to the largest class of persons who travel in our stages, and on our steamboats and railway cars. The sum must necessarily be a mean between two extremes in value; and while it may be, and doubtless would be, more than sufficient to cover the baggage of one class of passengers, it would fall much below the value of that of another class. If those whose comfort requires the conveyance of a large amount of baggage cannot· have it transported without the annoyance of reporting its value and paying to each carrier an additional sum for the excess over the amount to which a passenger is limited, other and competing modes of carriage would be created, and in the end the carrier would suffer more than he would gain by the attempt to lessen his risk by annoying or taxing the traveler.

Carriers and courts have, as I think, wisely left this question an open one; and the result is, I apprehend, less loss to the carrier than he would incur by limiting his liability and annoyance to the passenger.

The value of the baggage which a carrier obligates himself to carry being unlimited, the only other limitations are whether it is necessary for the passenger on the journey, in the course of which the carrier is employed.

This necessity depends on the pecuniary circumstances and the tastes and habits of the passenger, and it varies with the state of society in which he lives. What is necessary to a man of wealth and of refined tastes and habits,

may be wholly useless to a person of different tastes and habits; or, if he has the taste, they may be beyond his means. Necessity, then, as applied to this subject, is a relative term, and must determine in view of all the facts and circumstances of the case.

Again: the baggage must be such as is necessary for the particular journey that the passenger is, at the time of the employment of the carrier, actually making. It would be a most unreasonable extension of the rule to hold that a person going to a distant country to reside may fill his trunk with sufficient clothing to last him a couple of years, and hold the railroad or steamboat company liable for the value, as baggage for the journey. It would be equally severe to limit the quantity of clothing a young lady going to a watering place may carry as baggage, to that necessary to enable her to wear to and at her place of destination. She requires, according to her views of necessity and in conformity with the habits and tastes of the society in which she moves, as much as would be required by another and less fashionable person for use for a year.

The question is, in each case, for a jury, under proper instructions from the court.

That which will constitute baggage is, as already suggested, impossible to enumerate. The articles which will pass under the denomination of "other conveniences" are as various as the tastes, occupations and habits of travelers. The sportsman who sets out on an excursion for amusement in his department of pleasure needs, in addition to his clothing, his gun and fishing apparatus; the musician his favorite instrument; the man of letters his books; the mechanic his tools. In all these cases, and in a vast number of others unnecessary to enumerate, the articles carried are necessary in one sense to the use of the passenger. He cannot attain the object he is in pursuit of without them, and the object of his journey would be lost unless he was permitted to carry them with him. Yet, under pretense of carrying these articles, it by no means follows that the car-

rier is bound to carry a box of guns, a pianoforte, or organ, a library, or the tools and machinery of a machine shop. I believe there is no difference of opinion in regard to the liability of a carrier for the loss of such articles as are above enumerated, forming part of the baggage of a passenger.

A watch and such articles of jewelry as are commonly worn upon the person, are not as essential to the passenger as clothing or the articles above mentioned. But they are things usually carried on the person, and to some extent as necessary as the other. A watch is indispensable to a traveler. Why may they not be carried in a trunk with the rest of the passenger's baggage? I think experience has shown that such property is safer in a trunk than on the person while traveling. To hold that they may not be carried in a trunk, without notice to the carrier and paying extra compensation therefor, is to subject the passenger to unnecessary annoyance and to add but very little, practically, to the burthen of the carrier.

These considerations apply, in all their force, to money carried in a trunk or other package as a part of the traveler's baggage. It must be carried in some way—it is indispensible. Why may it not be carried in a trunk? Limited as it must be in amount to a sum sufficient to defray the expenses of the journey, why is it any less a part of the baggage than jewelry? If the one may be carried in a trunk at the risk of the carrier because it is safer when so carried, or because it may be considered as in some degree necessary, why may not the other? It is vastly more necessary, and its safety much more important.

To compel a traveler to carry his money on his person, (and he will be compelled to do so if the carrier is not liable for it as part of his baggage,) is to increase the danger he incurs of violence to his person, and to convert our public conveyances into convenient places for the pickpocket and the robber to carry on their callings.

If money may be carried as part of the baggage of a passenger, the next question is, how much may be so carried?

The cases in which it has been held that money may be thus carried all concur in limiting the amount to such sum as is reasonably necessary to defray the expenses of the journey. (Parsons' Merc. Law, 225; Angell on Carriers, § 115; *Weed* v. *Saratoga Railroad Company*, 19 Wend. 534; *Orange County Bank* v. *Brown*, 9 Wend. 85; *Judson* v. *Fall River Railroad Co..* 5 Cush. 69.)

The amount of money which may be thus carried will depend on the length of the journey, and, to some extent, on the wealth of the traveler. It is quite obvious that a man going from New York to China would require more money than if he were going to England only, and that a much larger sum would be required to defray the expenses of a millionaire than a poor Irish or German emigrant. In regard to amount, the jury must be guided by considerations similar to those which would govern them in determining what would be necessary clothing in a given case.

In the case before us. Strachwitz testifies that he intended when he left Germany to go to California, and procured the $800 in gold to defray his expenses. Of this sum he paid but $36 for his passage from Hamburgh to New York. He purchased a ticket for the steerage, with the lowest and poorest of his fellow passengers. At the same time he represents himself as of noble birth—an officer in the Prussian service, fleeing from his country because he had fought a duel with his superior officer—and without knowing whether his antagonist was living or dead, nor does it seem that he has even yet learned his fate. This story cast suspicion over his whole evidence, but it was for the referee alone to say how far such a strange tale should bear on his evidence. He has credited him. He therefore finds that the money was obtained in order to defray his expenses to California, and I am not able to say that the amount was unreasonable.

I will now proceed very briefly to consider the objections that have been urged against holding that a carrier is liable

for money carried in a passenger's trunk for the sole purpose of defraying his expenses.    It is asserted

1. That the carrier receiving pay for the carriage of the passenger only, does not receive compensation in proportion to the risk he runs, and of the extent of which he has neither knowledge nor means of knowledge.    If he is liable that liability may be to the extent of thousands of dollars, while the compensation actually received may be but a few cents.

I admit the hardship of the rule, where a loss for a large amount is incurred.    But, while the hardship should be fully appreciated, it cannot control the question of liability. When an express company receives a box of jewelry or of specie, to be carried a few miles, the risk is enormous, but it does not influence very much the price charged.    Yet the carrier is an insurer, liable for losses occasioned otherwise than by the act of God or the public enemy.    The carrier establishes his charge for the transportation of passengers and freight with knowledge of the general principles of law which regulate the business in which he is engaged; and, although he cannot know the full extent to which these principles may be carried, he must, nevertheless, take upon himself the risk.    He has a further protection, and that is, in certain cases, to limit his liability for property carried, unless the value is disclosed to him and an increased price paid, if demanded, on its carriage.    If he will not thus protect himself when he may, I can perceive no reason why courts should limit or change a wholesome and necessary rule of law in order to protect him.

When he contracts to carry a passenger, he knows that, by virtue of that contract, he is bound to carry his baggage without additional compensation therefor, and that he is liable for its value if lost.    If he will not require the passenger to disclose its value, he should not complain if the risk assumed is greater than the fare paid compensates. There is in law a sufficient consideration for the agreement to carry, and that is all that is required by the law.

2. It is further objected that money is no part of the baggage that a traveler usually has with him, and it ought not to be so considered. This is begging the question. In practice money is carried by travelers in trunks, and the reason why the carrier should be held liable for it, as part of the baggage, I have already given.

3. It is said to be unjust to a carrier, who carries a passenger a few miles only, to subject him to liability for money deposited in his trunk to defray the expenses of a protracted and expensive journey, while his compensation for his carriage is a mere trifle.

The injustice is not chargeable to the law, but to himself. If he contracts to carry the passenger and his baggage without inquiring as to its value, and thereby inform himself whether an additional compensation should be demanded, he should be held to the strict and literal performance of his contract as made.

4. It is said that the courts of this state have never held and should not now hold a carrier liable for money as part of a traveler's baggage, whatever may be the rule in other states.

I cannot assent to this proposition. The very fact that such is the law in our sister states, is a very strong reason for its adoption in this state, if it is not already a part of our law. It would be unreasonable that carriers in other states should be liable for money as part of the baggage of a citizen of this state and we refuse the citizens of such states the same protection in this. It is one of those regulations of trade and business that the public good demands should be uniform; and it would be ungracious and unneighborly to refuse to conform to the rule because our courts have not heretofore adopted it.

I do not find that any specific objections were taken before the referee to the allowance of the value of any item of clothing or other article in the trunk, except the money. In the absence of any such exception, we are not called to

say whether the allowance of the referee was or was not erroneous.

With the questions of fact we have nothing to do. While the rule entered by the general term declares the reversal to be for errors of fact and law, I conclude the errors of fact alluded to relates to the $800. The opinions of the learned judges suggest no other. And thus construing the rule, I think the finding was not exclusively of fact but one of fact and law, which the general term erred in reversing. If it could be held that the judgment was reversed upon the facts, there is undoubtedly sufficient evidence to justify the reversal. But as I do not think that such was the intention of the court below, I am of opinion the judgment should be reversed and a new trial ordered; costs to abide event.

All the judges being for reversal, except HOGEBOOM, J., who did not vote, and DAVIES, J., who did not dissent, judgment reversed.