## New York Marine Court.

*Trial Term—April 12, 1876.*

## JOHN P. REED *against* THE COMPAGNIE GENE-RALE TRANS-ATLANTIQUE.

**Liability of Common Carrier.—Act of God defined.**—The steamer "Amérique," while upon the high seas on a voyage from New York to Havre, encountered a violent gale, lasting forty-eight hours,

Reed *v.* Compagnie Generale Trans-Atlantique.

during which the vessel sprang a leak in her engine compartment, which could not be overcome by the pumps, and which increased to such an extent, that all the fires in the furnace were extinguished by the rising water, and the engine came to a stand-still. At about 5 P. M. of April 4, the captain finding that the leak was still making headway, that the engine compartment had many feet of water in it, that the fires in the furnace had been for some time extinguished, that the pumps could not be worked, and being convinced that the ship could not float much longer, took advantage of the presence of several vessels which had answered his signals of distress, transferred his passengers and crew to said vessels, and at about 8 P. M. abandoned the "Amérique," after first having held a consultation on the subject with all his officers, who concurred with him in the necessity of such a course. The "Amérique," though disabled, did not sink, and was found upon the ocean by two English steamers, and was towed by them into Plymouth, England. The plaintiff, who was a first cabin passenger upon the vessel, brought action to recover the value of his baggage and apparel, which were stolen from his state-room, after the vessel was abandoned. *Held,* that as the vessel did not go down, the defendants, notwithstanding the peculiar circumstances which led to the loss, were not relieved from their common law liability, as insurers against theft and robbery, and were bound to make good the plaintiff's loss. That if the vessel, without negligence, had gone down, the act of God would have been a complete answer to the action ; but, as it did not go down, there was no defense. The reasons stated.

*Benj. F. Russell,* attorney for plaintiff.

*W. L. Livingston,* attorney for defendant.

McADAM, J.—The defendants are the proprietors of the French line of steamers which run between this port and Havre. The plaintiff, on April 4, 1874, sailed on one of their vessels, "The Amérique," for the voyage from New York to Havre aforesaid. He was a first cabin passenger, and took with him in a securely-packed trunk and portmanteau, the baggage, apparel, and other property necessary for an extended European tour.

The steamer left New York in good condition, but

Reed *v.* Compagnie Generale Trans-Atlantique.

during the voyage encountered a violent gale, lasting forty-eight hours, during which the vessel sprang a leak in her engine compartment, which could not be overcome by the pumps, and which increased to such an extent that all the fires in the furnace were extinguished by the rising water, and the engine came to a stand-still. At about 5 P. M. of April 4, the captain, finding that the leak was still making headway, that the engine compartment had many feet of water in it, that the fires in the furnace had been for some time extinguished, that the pumps could not be worked on account of the stoppage of the engine, and being convinced that the ship could not float much longer, took advantage of the presence of several vessels which had answered his signals of distress, transferred his passengers and crew, and finally himself, to said vessels, and at about 8 P. M., abandoned the " Amerique " in about latitude 48° 30′ and longitude 9° 54′, after first having held a consultation on the subject with all his officers, who concurred with him in necessity of such a course. The "Amerique," though disabled, did not sink, and was found upon the ocean by two English steamers, and was towed by them into Plymouth, England, where she arrived about April 19, with much water in her engine compartment, and some, but not so much, in another of her nine compartments, five of which were water-tight. The passengers taken from the disabled steamer arrival in France by the relieving vessels about the same time the " Amerique" was being towed into Plymouth. When the news of the " Amerique's " arrival reached Paris, the defendants then and there sent a telegram to Captain Bocandé, who was then at Newcastle-on-Tyne, in England, stating the fact, and directing him to proceed at once to Plymouth, where he would find instructions at the French consul's. The order was obeyed, and Captain Bocandé arrived at Plymouth on the 20th, and

found the "Amerique" in possession of the salvors, went aboard, and there saw a rough lot of people, numbering about 200, eating and drinking. The passengers' trunks and packages in the state-rooms had been ransacked, and were in many cases pillaged and depleted, and what were not carried away were strewed in confusion about the cabins.

The collector of the customs at Plymouth succeeded the salvors in the possession of the vessel, which he retained until after it had been libeled by them for salvage, when it was bonded and turned over to the defendants. The things strewed around the cabins were collected together and were replaced promiscuously in the open trunks, which, when filled, were tied with ropes and straps. These fragmentary and mixed-up effects of the passengers were forwarded to Paris, and were distributed, as far as identified, to their respective owners. In many instances identity was difficult, and in some cases impossible. The plaintiff received a trunk containing another man's shirt, a lady's cape, and other things that did not belong to him. These were returned to the defendants with a demand for his own property or compensation for its loss. The defendants declined to pay, and this action is brought to enforce their supposed liability.

The plaintiff contends that the safe arrival of the "Amerique" at Plymouth, together with the fact that five of her compartments were even then water-tight, conclusively demonstrate that she was not in a sinking condition when abandoned by her officers and crew, and that the abandonment was, therefore, ill-advised and unnecessary. While this argument has significant force on the ulterior question of liability for the lost baggage, it is to be accepted in a modified form in regard to the transfer of passengers, for the reason that the conduct of the officers is not to be judged in the light of after events, but according to the circum-

stances in which they are found when called upon to make a choice of an embarrassing alternative (Faulkner v. Wright, 1 *Rice*, on p. 121). They could not be oblivious to their responsibility for the lives of the passengers entrusted to their care ; and the conviction of imminent danger, which seems to have been shared by them all, may be taken as a justification for their transfer to the relieving vessels, without approving of the total abandonment of the steamer, or excusing the defendants from their liability as insurers for the safe carriage and delivery of the passengers' baggage at the port of destination.

Common carriers, as a rule, are liable for all damages and loss to goods during the carriage, from whatever cause, unless from the act of God, which is limited to inevitable accident, or from the public enemy (*Redfield on Carriers*, § 24). And the exceptions to the rule are limited to accidents which come from a force superior to all human agency, either in their production or existence (*Ib.*), and the cases agree in requiring the entire exclusion of human agency from the cause of the injury or loss. If either happen in any way through the agency of man, it cannot be considered the act of God. In short, to excuse the carrier, the act of God must be sole and immediate cause of the injury, for if there be any co-operation of man, or an admixture of human agency, the injury is not, in a legal sense, the act of God (Merritt v. Earle, 29 *N. Y.* 115 ; Michaels v. N. Y. Central R. R. Co., 30 *Id.* at p. 571), and the baggage of a passenger is under the same protection as the goods which are entrusted to a common carrier (Orange Co. Bk. v. Brown, 9 *Wend.* 85 ; Camden & Amboy R. R. Co. v. Burke, 13 *Id.* 611 ; Powell v. Meyers, 26 *Id.* 591 ; Merritt v. Earle, 29 *N. Y.* 115 ; Merrill v. Grinnell, 30 *Id.* 594) ; and the carrier of passengers by steamers is not exonerated from responsibility for the personal baggage of a passenger

by the fact that the passenger deposits it in a state-
room occupied by him, of which he has the key, and
from which it is stolen (Mudgett v. Bay State Steam-
boat Co., 1 *Daly*, 151), nor by the fact of having either
a supervision over it, or the means of entering the
place of its deposit. The liability of a common carrier
has its foundation in the policy of the law, and exists
independently of the contract, and extends to any rea-
sonable amount of baggage carried by the passenger
for his personal convenience on the journey (Nevins v.
Bay State S. Co., 4 *Bosw.* 225), and includes a proper
sum of money contained in his trunk to cover travel-
ing expenses (Merrill v. Grinnell, 30 *N. Y.* 594). And
the liability extends to all cases of theft, robbery, and
embezzlement by any of the crew or by other persons,
notwithstanding the fact that the carrier may have ex-
ercised every vigilance to prevent the loss (*Story on
Bailments*, §§ 528, 529). The plaintiff's property was
pillaged while upon the defendants' vessel, and as in-
surers against theft and robbery the defendants must
make good the loss. The peculiar circumstances
which led to the loss do not militate either against the
propriety or stringency of the rule. If the vessel,
without negligence, had gone down, the act of God
would have been a complete answer to the action ; but
as it did not go down, there is no legal answer to it,
for the plaintiff's property disappeared, not through
the act of God, but by the dishonest act of man, for
which the defendants are answerable, as common car-
riers. The subsequent arrival of the vessel proves that
its total abandonment was one of prudence rather than
of actual necessity, and although the officers may be
exempt from criminal censure, the defendants must be
holden to their full common law liability to the pas-
sengers for their lost baggage. It is said, that the case
is without precedent, that none resembling it can be
found in the books ; but this circumstance is no argu-

ment against the defendants' liability, which is put upon legal principles, well established by judicial authority. The plaintiff will, therefore, be entitled to judgment for $500, the assessed value of the property in France, the port of delivery.

Judgment accordingly, with costs, and five per cent. allowance.

This decision was affirmed by the general term, and the judgment was paid.

In the case of The Thuringia (41 *L. J. Adm. N. S.* 44, 1872), involving the question of the propriety of an abandonment of a ship, Sir R. J. Phillimore says : "In addition to care, must be added courage and resolution; for whether or not the latter element be required in the driver of a carriage, in the case of a collision on land, it is certainly required, and has often been so decided, in the master of a vessel, in the case of a collision at sea. The law requires such courage as belongs to the ordinary exercise of the profession or calling of a seaman. If the party complaining be a sailor, he cannot succeed in his suit, if it be shown that the danger which has caused his loss could have been avoided by a sailor's ordinary courage and skill."